We have two cases on the calendar this morning involving one patent and one patent owner and two opponents to the patent. Before we do, we have present activity, which is an admission to the bar of one of our law clerks, and Judge Dyke has a motion to make. Thank you, Judge Lurie. I move the admission of my law clerk, Sharon Moeen-Goswami, and she's a member of the bar in good standing of the highest court in the state of New York. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Indeed, she more than possesses the necessary qualifications. She's been a really outstanding law clerk, and I'm very happy to see her admitted here and look forward to many years in which she gets to appear before this court. Eventually, probably not in the immediate future, but hopefully in two or three years, and I'm sure you will be as outstanding an advocate as you have been a law clerk, and I thank you for your service. Thank you for that motion, Judge Dyke. I particularly noticed the phrase beginning in deed. Judge Rayner, do we need to consult about this? I don't think so. Then we grant the motion. Would the applicant please take the oath of office from the clerk? Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? Yes. Congratulations, and welcome to the bar, under certainty. Congratulations, and we look forward to serving as a member of the bar. The first case is Farring v. Watson and Apotex, although this is principally the Apotex case, I believe, 14-13-77, and before you begin, Mr. Monroe, with you and others, at whatever time you think appropriate, tell us what is and what is not. Confidentiality is not confidential here. There's a lot of confidential labeling that makes it difficult for us to ask questions and the right opinions. I think for purposes of my argument this morning, I won't be pointing to anything specifically confidential. However, I will be referring to recent amendments, and I think that was marked as confidential under the protective order and then in a confidential brief. It's really Apotex's confidentiality, which I need to. I can refer to it broadly without doing the specifics, but that would be difficult. Then maybe when Mr. McPhail stands up, he can tell us what really is or is not confidential. I'd just like to say I agree with Judge Lurie that there's much too much material designated as confidential here, and you want to get together and remove the confidentiality designations for most of this material. Yes, Your Honor. Fairing has nothing confidential in the brief, so we're open to anything. Please proceed. Good morning, Your Honor. The court, the parties litigated a particular ANDA for three years and eight trial days, and at the end of all of that, the district court found that that particular ANDA infringed all three of Fairing's patents in suit. That infringing finding required the district court to reset the effective approval date of Apotex's ANDA, effectively converting what was a final approval into a tentative approval, and also requiring Apotex to then convert its Paragraph 4 certification to a Paragraph 3 certification. But things have changed, right? We have amendments, and isn't it fairly clear from the amendments that the dissolution rate of the ANDA product will not meet the limitations of the patent, and so there's no infringement? No, Your Honor. There's no evidence of record to support the 75% arbitrary cutoff that the district court set. No fact witness, no expert witness, the part, no part. I don't understand, why do they need a witness? The ANDA has been amended to state its 75% rate, which is outside the patent, right? No, Your Honor. We also think the district court committed clear error in not interpreting the claims in the patent, in particular the term about, as encompassing plus or minus 10% as provided for in the USP-27, which is specifically recited in the claim. The claims make reference to USP-27, and USP-27 specifically provides that when you're talking, you use the term about, it actually refers to the term about in the context of USP testing, that term encompasses a plus or minus 10% variance. But the claim language does use the word about, right? No, it does, Your Honor. The claims refer to about 70%, and therefore the proper interpretation of the claims would be up to and including 77%. And we believe it was legal error for the district court not to interpret the claim correctly under that standard. During the Markman hearing, the district court, during the oral proceedings, indicated he would interpret the claims as being plus or minus 10%, but then in his written decision, he changed his opinion to approximately, and said we could argue about that at trial. So we repeated what we did at the Markman hearing at trial and presented evidence on the plus or minus 10% variance that's in the USP. And our expert's testimony on this was agreed to by one of Apotex's own 30B6 witnesses, who agreed that under the USP, one looks to the language about and interprets it as plus or minus 10%. So that's a legal reason why we believe it's incorrect. Now, didn't Mr. Browning agree? The question being, I don't think there's any basis for me to find Apotex as violating 271A. Mr. Browning, I agree, Your Honor. I will concede that point. Mr. Browning was conceding the 271A issue, which was not actually in dispute in the case. Faring had not asserted 271A against Apotex. During the course of the case, Apotex did produce a small number of samples that were at one end of the full spectrum of its ANDA. Those samples did not meet the dissolution limitation. But the license that Apotex was seeking from the FDA is much broader and encompasses a much larger number of products. And that's what the district court on its own found, that the existing ANDA, up until closing arguments, encompassed infringing product. And there's a second point. It's not just a legal issue of claim construction. But if this came under Vlaxo rather than Synovian, the concession that there was no 271A infringement would mean that the product didn't infringe and that the ANDA didn't infringe, correct? I respectfully disagree, Your Honor. Under Vlaxo, the issue was it didn't really speak to the issue of whether the scope of the license was so broad as to encompass the one. Well, I understand that you may not agree that this is a Vlaxo-type case, but if this is treated as a Vlaxo-type case and, in fact, there is no range in the original ANDA, and let's just ask you to assume that this comes under that Vlaxo situation and you have to look to the actual product that was sold, doesn't your stipulation that there's no 271A infringement mean that that means that the ANDA itself is not infringing, no? No, Your Honor. What is that? Appetect has within its power to do sort of what it tried to do during closing arguments. Appetect had within its power to seek approval for a product that was – the scope of which, the license they were seeking, was narrow to that specific product. I think you're not accepting my hypothetical that this comes under Vlaxo. You can disagree with that. I know you do disagree with it and you look at this as a synovian-type case, but let's assume that you're wrong about that and that this comes under Vlaxo and that we have to look to the actual product. Just assume that in answering the question. Doesn't the 271A stipulation mean that the ANDA is not infringing if this is a Vlaxo-type case? That stipulation only means, even under a Vlaxo case, that the stipulation as to 271A applies to infringement under 271A, not under 271E. Well, I don't see what the difference would be if we have to look to the product under a Vlaxo-type case. Why would there be any difference between looking at the product for purposes of 271A and 271E? Because in Vlaxo, there was a focus on the product itself because the ANDA did not address the issue. That's why it looked at the product itself. But why doesn't the stipulation as to no 271A infringement mean that the product itself does not infringe? It seems to follow. It means that the actual, that particular sample that they gave us did not fall within the scope of the claims. It doesn't mean that the license they're seeking does not fall within the scope of the claims. But if we have to look at the actual product, you haven't brought in any evidence that the actual product infringes, right? We've only brought in with the few samples that they provided. They selectively chose what samples to provide. It's up to you. I mean, you have the burden of proof. You have to show that the product infringes if this is a Vlaxo-type case. How could you prove that the product infringes when you stipulated that it didn't? In the context of a Hatch-Waxman case, there was no commercial product on the market to test. We had to rely upon the specific samples they gave us, and that's what AptX tried to do. They sought a broad license. They gave us various samples at one end of that license. We stipulated that those products at that very end of that license did not infringe and would not constitute infringement under 271A. That did not solve the issue under 271B. So what's the evidence that the product infringes if we look to the product under Vlaxo? We're not arguing that the samples they provide us were 271A infringement. We're arguing that they should not be allowed license. I'm sorry, you're not responding to my question. The question is, if this is a Vlaxo case where we have to look at the product, what was your evidence that the product likely to be sold infringes? We did not. I understand you disagree with me, Your Honor, on what law applies, but our argument is that we will concede, which I know is what you're seeking, that there was no evidence of an actual sample being tested as falling within the scope of the claims. Okay. But there is evidence of what the ANDA will permit in relation to the claims, and that won't infringe. That's correct, Your Honor, and that is the basis for argument. And there's also evidence, which I didn't mention yet, even with respect to his arbitrary 75 percent cutoff, there's evidence in the record when the issue was 80 percent that it's not just the dissolution specification in their ANDA. They also have a specification with respect to the amount of tranexamic acid that can be in their product, and that allows them to have much more than what the label claim says, which is 650. They can have up to 687.5, 82.5 percent, 82.5 milligrams of the drug in their product. And when they do dissolution testing, what they're testing is to see how much drug they get at 45 minutes or at 60 minutes. And they compare that amount of drug to what you would expect to see if you started with only 650 milligrams, when in fact they're allowed to produce product having much higher amounts of tranexamic acid. And if you do the math, which was presented at trial and unrebutted, you see that they are allowed to produce product that gets as low as 71.4 percent of release, which falls well within the 75 percent number that the judge arbitrarily selected. And our main issue is that this was not an issue that was ever litigated. Throughout the trial, out of 10 percent... It would be better off, wouldn't you, if you just embraced the amendment and said, great, we're going to argue about the amendment. I mean, you shouldn't... We wouldn't allow... Your interest, because of the concession that you made in the Vlaxisnovian thing, suggests that you're better off arguing about the amendment than the original amendment. But that's up to you. I disagree, Your Honor. There's those procedural aspects of the Hatch-Waxman. It's designed, the compromise was designed, to have an applicant go to the FDA, tell it the scope of the license it wanted, do a paragraph 4 certification. If there was an infringement finding, they have to convert back to paragraph 3. And then if they want to try again, they can amend their ANDA and do a new paragraph 4 certification and deal with that issue. Appetek stayed silent, never even tried that. It was only during its closing argument when it essentially made an offer of judgment. Are you saying there was never a paragraph 4 certification? Not to the amended ANDA. I mean, they didn't amend the ANDA until after closing argument. And before the post... Well, even at the post-trial hearing, we were still talking about whether the amendment was correct. They had to certify that it didn't infringe or that the patent was invalid. They didn't, Your Honor. They made the argument during closing argument when the court judge said, I'm going to let you off the hook. Then how can they file an ANDA to basically copy the innovative product without saying either it doesn't infringe or is invalid or we'll wait until it expires? Our position is they can't. They did an original filing on one ANDA. That's what we litigated. That's what we tried. And the district court found in his judgment that that constituted infringement. That should have been it. And they should have had to... If they had amended it at that point, they should have had to recertify under paragraph 4. And we would have litigated that issue. There was absolutely no evidence at trial, fact, witness, party, argument, written evidence, about the 75-year argument. What's your argument? That there was no amendment or that if there was an amendment, that it was notified too late? We now know that there was an amendment. We haven't seen all the documentation surrounding that amendment, but we know there was an amendment, which occurred after trial. Their discussions were in closing argument. They promised they would go make an amendment and they did an amendment. That was too late. We had no opportunity to have that issue. They can't change the ANDA because there's an order from the district court that they can't, right? But even that change didn't infringe itself. Yes. They can't change the ANDA, right? Well, they can't change the dissolution specification without telling us and telling the court. They did stipulate to that. But even that dissolution specification still encompasses infringing product. So in the first instance, it was legal error from the district court not to follow the Hess-Waxman Act and what it specifically provides for. Secondly, the claim construction was wrong. And even if you don't look at claim construction, from a fact-finding standpoint, there was no evidence supporting that 75% would be non-infringing. Mr. Monroe, you're halfway through. Do you want to save it or use it? I'll save it. I think you hit on one of the issues that I was going to address. Okay. Mr. McPhail? Thank you very much. May it please the court, Don McPhail of Kozma-O'Connor for the Apotex Parties. What we need to recognize here is the fact that there wasn't just one ANDA, not the one ANDA Mr. Monroe wants to focus on. There were actually three versions of this ANDA. The originally filed ANDA had nothing about dissolution in the USP-PADL test, so that would have been the perfect Claxo case. It didn't say anything about infringement whatsoever. The FDA asked for a quality control check and a dissolution profile was put in there. That's the end that Mr. Monroe wants to say infringes. Not because it covers what his patent does, but because it doesn't tell you one way or the other whether it covers what he does. That simply talks about an amount dissolved at 60 minutes. His patent calls for a time limit of 45. So there's nothing in there either. That could be a Claxo case. He argues it's synovia. But more importantly, that one doesn't matter anymore. Before judgment was ever entered in this case, that ANDA got amended again to add this limitation, not less than 75, that takes them outside the scope of the claims. So what about their argument that about in the claim means plus or minus 10%? The district court expressly rejected that, not just at Markman, but also during trial. When their expert, Dr. Williams, got up there and tried to testify on infringement and say for infringement he thought approximately meant plus or minus 10%, district court slammed him on that and said, no way. I absolutely disagree with that. Later on, the district court gave examples. They disagree now with the district court, right? No. They've never agreed with the district court on that one. They still, even in their brief, want to go back to the plus or minus 10%. And I'll just note that the district court in its Markman made the effort. But they're arguing that about means plus or minus 10%. The district court rejected that. That's correct. So it's up to us to determine what the correct claim construction is. That's correct. Is it approximately or is it some strict numerical limitation like the parties had asked the district court to determine? Right now, all we have from the district court is approximately. What was their position on claim construction in this respect before the district court? At the Texas position? Yeah. At the Markman hearing, it varied. It was one percentage when it came to time of plus or minus, I think, 2%, and another when it came to weight of plus or minus 5%. It was not a universal about equals 10% for all times about is used. So if it's about 45 minutes, that'd be plus or minus 2%. If it's about 500 grams, that might be plus or minus 5%. But it was not a universal plus or minus. They didn't argue for the plus or minus 10%? They argued against the plus or minus 10%, said that was too broad in all instances, said the USP should not control this. Again, if they wanted the USP to control it, they could have said that in the spec. If they wanted about 70 to mean 77, they could have just said less than 77, and we wouldn't be having this argument. But they said about and then went to the USP, extrinsic evidence, to try and come up with this plus or minus 10%. After the claim, after the Markman? No, they did it for the Markman. That was their presentation at Markman. I will say that. They've been consistent throughout. It's the USP too. That's what they rely on for the plus or minus 10%. And so why is the plus or minus 10% wrong? The USP too does not control it here. If you look at the patent, it does not appear in the patent that they intended. None of the values given in the examples require a plus or minus 10%. When you look at the testimony of the various experts who testified at Markman, outside of their expert, the other experts and actually a fact witness we put on at trial, Dr. Kovacs, testified that plus or minus 10%, particularly as it relates to times, is almost a ridiculous factor. What light does the specification shed on what about means? I think only so much as what the district court says. It shows it does not have a strict numerical limitation. It is a relative term. And he made it relatively approximate. I think he wanted to punt it to the jury, but didn't remember this was going to be a bench trial. How do you respond to your opponent's argument that the amendment was not effective here to change the original end of it? I really disagree. First of all, that wasn't the only amendment. There was an amendment earlier, which is the one they rely on to try and show infringement. So they can't get to say one amendment's good and the other amendment's not good. We want the original end, and we are definitely under Glaxo because there's nothing about this solution. The point here is the last amendment was filed before judgment was entered. 271E4 cannot kick in until judgment gets entered. Judgment was not entered until the end of March. The amendment was made, was effective, and granted by the FDA in early February. They had a chance to be heard on it. There was a hearing on March 5th in Reno. They had a chance to argue, and they argued that amendment shouldn't be good enough. It should have to say 77%. And the district court rejected them again. They said, if it said 72%, maybe I'd give you something. It said 79%, no way. But I'm not making them go up to 77% because I disagree with your expert's 10% variance. Didn't the Bayer case involve an amendment during litigation? Yes, it did. Now, that was not as late in the game as this one was. It was before judgment. It was before summary judgment. In Bayer, the case that's filed did not have the specific surface area limitation. That was then added to the amendment, took them outside the scope of the infringement. Was there a new paragraph 4 certification in Bayer? No. We had a paragraph 4 certification of non-infringement. The fact that we added an extra reason not to infringe, because we still believe the original tablets don't infringe. All the tested tablets didn't infringe. The best they could show was 80% dissolution in 45 minutes, even outside the scope that they're about. They never had actual infringement. So for Claxo, you look at the product, and we're definitely out. We thought that was good enough. But just in an abundance of caution to satisfy the district court, we were willing to go back and put in an express amendment to relieve any anxiety he had. And you see here, they actually got more than a 271E4 solution, right? That would just say put the approval date out as expiration of the patent. He's told us we can never change our agenda. We have to go back to him and get his permission. We have to tell them what we're going to do. We're stuck with this, even after their patents expire, absent his permission. So what would E4 have gotten? E4 would have gotten a change of the approval date of the prior version of the ANDA. But that ANDA doesn't exist anymore. The only ANDA that exists now, the only ANDA that Apotex Market's under, is the non-infringing ANDA. The court heard plenty of evidence on the scope of that claim and decided, during trial, listening to their expert, that 74 would be outside the scope of the claim. And then on the end of the day, decided that there was an ANDA at 75. 75 and greater was absolutely out. There'd be no need to infringe it. Up until the statement seen in the late March order, the district court consistently told counsel for fairing that he would not find that Apotex's original ANDA infringed. He did it at the trial. He did it again at the March 5 hearing. So there was no judgment of infringement against Apotex before it changed its ANDA. And the only ANDA that controls now is that amended ANDA, which doesn't infringe. So your argument is that an amended ANDA, as long as it happens right before judgment, that it's effective to change the original ANDA. It should be effective to change, particularly whereas here, there was testimony. A week before judgment or a day before? As long as there's testimony to support what the judge did, why that change was made, which came here, the judge specifically said, an ANDA with greater than 75 won't infringe. So that's the amendment that was made. Does the judge have discretion as to whether to allow the amendment to be considered? I believe he does have discretion to consider whether to allow the amendment to be considered. I think he has discretion to consider any evidence that's presented to him before the entry of judgment. Would part of that discretion involve surprise on the other parties if they're not notified of the amendment? I don't think they were surprised here. There were discussions with them about the amendment before it was ever even submitted. They got copies of the stipulation. They submitted objections to the stipulation. So they've seen it. To say they've only just seen it now is surprising. It's in the binder. It's A505. And they've met it. When did the proposed amendment first surface in relation to the trial? It definitely came up at the March 5th hearing. It was granted on February 21st. And at the March 5th hearing, it was specifically discussed by counsel. So sometime between the 21st of February and the 5th of March, there was a hearing on both sides' motions. Well, in other words, the March 5th was the beginning of the bench trial? No, the bench trial was at the end of January. Following the bench trial, before judgment was entered, Apotex filed its amendment. Both parties then filed motions. The amendment first surfaced after the bench trial was concluded? That's correct, yes. Yes, the judge first told us on the 30th, first decided on the 30th, which was closing arguments, that an amendment with having greater than 75% dissolution would not infringe under 271E2. We then went out and submitted our amendment to the FDA as soon as we could. OK. Are there any further questions? Yes. We didn't hear any response on confidentiality. Do you want to waive confidentiality for everything in your brief? Or do you want to send us, within one week, a new brief? We are fine waiving confidentiality of what's in the brief. You say you're waiving it? We're waiving it, yes. Thank you very much. Yes, Your Honor. Thank you very much. Why don't you fix this with the clerk's office of the confidentiality designations of the public brief? Absolutely. We'll take care of that this afternoon, Your Honor. Mr. Monroe has two and a half minutes for rebuttal. Thank you, Your Honor. First, the point that if we wanted the USP to control, we should have just said so. We did. It's in the claim. The claims actually specifically recite USP-27. And that is what our expert relied upon, that if you looked at that once, go to the article, see USP-27. Go to USP-27, which is in the record, which shows that you do plus or minus 10% variance when using the USP. How were you prejudiced by the amendment coming up after the benchmark? Thank you, Your Honor. I think the timing is important, the question that just came up. The end of the trial was January 30th. We did not get to the issue of what the amendment might look like until the end of February. And we had been objecting, even during closing arguments, when Apotex raised this for the first time. We saw a potential amendment in February. We had to speak about it. OK, but that's not answering my question. My question is, how are you prejudiced? We never had a chance to try the issue. Did you ask to reopen the record after the amendment? Yes, Your Honor. We objected to everything. We requested two things. One, that the district court follow the Hatch-Waxman Act. Two, we were allowed an opportunity to vet the issue with respect to this new information. It was a post-trial generated argument, post-trial created evidence. Where do I find your request to reopen the record? I don't have that sign in hand, Your Honor. But what kind of evidence would you submit anyway to rebut the FDA amendment? I mean, it's clear on its face that it took it outside infringement. Well, it didn't, Your Honor. We still have the issue that the specifications with respect to the amount of tranexamic acid that can be present broadens the dissolution profile. That actually, it now allows, their ANDA allows them to produce a product that goes down as low as 71.4% at 45 minutes. But that's a claim construction issue. That doesn't require any evidence. No, Your Honor, that's not a claim construction issue. I'm not focusing on the USP-27. You're focusing on the word about right now. No, I'm not, Your Honor. Just looking at the evidence of their specification in their ANDA for the amount of tranexamic acid, it allows them to vary it widely. It includes the upper end of 682.5 milligrams of tranexamic acid. When they do their testing, they just look to see if there's 487, I think it is, .5 milligrams. 487.5 over 682 is 71.4. I'm sorry, I'm not understanding what you're saying. The ANDA amendment said that it would be 75% at 45 minutes. So what evidence did you want to present that you say you didn't get a chance to present that was there on the issue of whether that amended ANDA infringed? First, we wanted to present evidence with respect to how this was implemented and what the standard deviation was and how this was actually going to be implemented and with respect to the issue I just raised, which was already litigated, the issue that even with 75%, their ANDA still allows them to operate at a 71.4% level as a practical matter. That expert testimony was unrebutted. I don't understand. That sounds like claim construction. It's not. Claim construction is a plus or minus 10% of 70. That's the claim construction issue. There's a separate issue outlined in our brief that discusses the evidence at trial regarding the range of the amount of tranexamic acid present in the tablets as manufactured. That's a different issue. So why would we look to the tablets as manufactured when there's no 271A infringement and we're solely looking at the ANDA? The ANDA allows them to manufacture tablets having up to 682.5 milligrams of tranexamic acid. But the dissolution test that one does, when one carries it out, one only looks to see what percentage of the label claim, 650, is present in the dissolution test at 45 minutes. That amount equates to 71.4% of that upper range for amount of tranexamic acid. That's a fact issue. You had the opportunity to make this argument before the amendment. Not with respect to the 75% issue. We did make the argument that it's in the trial record regarding their existing ANDA at the time, which is the 80% limitation. We laid that all out in our trial with respect to the 80% limitation, and then when the 75% amendment came up post-trial, we argued we would be able to make the same argument. But we weren't allowed to do that. The court said, I'm not going to let you litigate this anymore, and I'm deciding the issue. When the court advised Apotex that they should supplement to specify 75% in their amendment, did you object at that time? Absolutely, Your Honor. We objected multiple times during closing argument when they raised it for the first time. Then we objected during the post-trial papers. Then we rejected at the March 5th hearing. Well, that's my point. I mean, you did have opportunity to argue. He would not allow us to present evidence or argument on it. The district court just said he's decided for 75%, period, as a fact-finding. Thank you, Mr. Monroe. The case is submitted.